IN THE SUPREME COURT OF MISSISSIPPI
NO. 94-KA-00397-SCT

*KENNETH LEON BOUNDS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/22/94 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CHARLES W. WRIGHT, JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE MCCRORY |
| DISTRICT ATTORNEY: | MITCHELL, BILBO, |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 2/13/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/6/97 |

**BEFORE DAN LEE, C.J., BANKS AND ROBERTS, JJ.**

**ROBERTS, JUSTICE, FOR THE COURT:**

**STATEMENT OF THE CASE**

¶1. This appeal is brought before this Court by Kenneth Leon Bounds (Bounds) from the Circuit Court of Lauderdale County where he was charged with burglary of an occupied dwelling (Count I) and kidnapping (Count II). As to Count I, the jury found Bounds guilty of the lesser-included offense of willful trespass, but was unable to reach a verdict as to Count II. A mistrial was declared as to that charge. Bounds was sentenced to a term of six months in the county jail and ordered to pay a fine of $500 and court costs of $104.50.

¶2. Bounds has appealed that decision to this Court raising the following issues on appeal:

> **I. THE TRIAL COURT ERRED IN GRANTING THE STATE'S PEREMPTORY CHALLENGES OF JURORS ON THE BASIS OF GENDER WHICH AMOUNTED TO INTENTIONAL DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE AND THEN IMPROPERLY DENIED DEFENDANT BOUNDS' PEREMPTORY CHALLENGES, EVEN AFTER A GENDER NEUTRAL**

**EXPLANATION HAD BEEN GIVEN.**

**II. THE TRIAL COURT ERRONEOUSLY ALLOWED THE ADMISSION AND PREJUDICIAL USE BY THE PROSECUTOR OF EVIDENCE OF OTHER BAD ACTS, MISCONDUCT AND CRIMES WHOSE PREJUDICIAL EFFECT OUTWEIGHED ANY PROBATIVE VALUE.**

**III. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT OF ACQUITTAL AND/OR IN THE ALTERNATIVE A NEW TRIAL DUE TO INSUFFICIENT EVIDENCE.**

## STATEMENT OF FACTS

¶**3.** Bounds is a resident of Newton County, Mississippi, who worked for his father in the family's business, Bounds Oil Company, located in Forest. Bounds was involved in a stormy relationship with Brenda Guin (Guin), who he had met in the fall of 1991. The two began dating and later became lovers. Guin moved into Bounds' trailer and began cohabiting with him. The two later moved into a residence located on property owned by Bounds' father. They then moved in with his parents for a little over a year. During this time she did not pay rent or contribute to the household but was treated like a family member.

¶4. In June of 1992, Guin learned that she was pregnant by Bounds and expecting a child. Bounds was happy about the pregnancy, but the relationship remained volatile. Bounds and Guin would separate often, only to reconcile shortly thereafter. Guin wanted Bounds to propose marriage to her and was expecting an engagement ring at Christmas of 1993. However, Bounds gave Guin a gold necklace instead, and Guin left the house abruptly. She returned the next day.

¶5. Guin bought a trailer in Lauderdale County and wanted Bounds to move in with her. Bounds' family helped pay for necessities (pots, pans, bathroom accessories, etc.) for the home, and the two again began to cohabit outside the union of marriage. There is some disagreement as to exactly how long Bounds stayed at the trailer; however, he left after a confrontation with Guin's uncle, who wanted him off the property. Upon learning of this incident, Guin went to the Bounds' residence in order to learn what had happened. Guin was unsuccessful in getting Bounds to return to the trailer, because he did not want another confrontation. Guin stayed at the Bounds' residence until January 27, 1993, when Bounds began to talk of moving to Oklahoma. She moved back to her trailer in Lauderdale County.

¶6. On February 16, 1993, Bounds sent Guin roses, balloons, and a teddy bear at Rush Hospital in Newton, where she was a registered nurse. The two parties have differing testimonies as to the exact details of the events that occurred later that day. It is undisputed that Bounds went to Guin's trailer sometime on the night of February 16. He testified that he went over at a pre-arranged time in order to work things out with Guin and reconcile the relationship. Guin claims that she did not want the flowers, balloons, and the teddy bear that had been sent to the hospital. In fact, Guin testified that prior to seeing him on February 16, at her trailer, she had not talked to him since the first of January. She stated that when Bounds would call her at the hospital she would either refuse to talk to him or just hang up on him.

¶7. Bounds testified that he and Guin agreed that they would talk on the night of February 16, when he returned from a trip to Starkville. When Guin left work she went to her parents' house to eat supper and visit. Her trailer is less than one hundred yards away from her parents' house. Guin testified that she went to her trailer, took a shower, and got into bed to read a catalog. She states that she woke up when she heard someone banging on the front door to her trailer. Guin testified that Bounds was the one at the door, and he ultimately broke the window to enter the trailer. Guin claims to have then opened the door and ran towards her parents' house to get away from Bounds. Further she states that Bounds pushed her down and dragged her back to the trailer, where she was forced into his car when he "smashed her head into the door frame."

¶8. The events that happened at the trailer are presented in a very different light by Bounds. He states that they were to meet around 7:00 p.m., but because he was late, she refused to see him. He testified that this had happened before when she locked him out of his own bedroom at his house for being fifteen minutes late coming home at night. Bounds states that he went over to the window because he knew he could see in. He asked again to talk to her and was refused. He got mad and hit the window causing it to break. This caused Guin to open the door and come out to see why he had hit the window. Bounds says that he did not intend to break the window and would pay for the damage. Guin noticed that Bounds' arm was bleeding terribly, and he began to walk towards his car. She began to walk to her parent's home when Bounds asked her what she was doing. It was at this point, according to Bounds, that Guin informed him that she was having pains in her right side. Bounds thought this meant she was in labor and was about to have the child. When he asked her what to do, she told him to take her to the hospital.

¶9. Guin and Bounds both agreed that they started to the hospital. They both agreed that Bounds was in a hurry. They even agreed that they stopped at the Super Stop convenience store. However, neither agree as to the reasons why the events transpired as they did.

¶10. Guin told the court that she wanted to go to the hospital in Meridian, but Bounds would not take her there because he was afraid she would tell what he had done. She claimed that the only reason why Bounds stopped at the Super Stop was so he could call his mother. Guin testified that after she sat in the car "for about thirty seconds trying to figure out what to do," she ran into the store telling the workers that she was in labor and to get help. According to Guin, Bounds then begin to tell the workers that they were married and this was their first child.

¶11. Bounds told a different story. He stated that he wanted to get her to the nearest hospital in Meridian, but Guin wanted to go to the hospital in Newton where she worked. Bounds stated that Guin told him that she was not going to make it and he was going to have to stop at the nearest place. He ran inside to have the people inside to call his mother to let her know that they were on their way to the hospital. Guin came inside and said that she was not going to make it, and Bounds told the workers to call 911. He went outside to move his car when Guin told the workers that he had kidnapped her and to get help.

¶12. Despite the conflicting testimony as to the events prior to the police arriving at the Super Stop, the facts are clear that Bounds was arrested and placed into a patrol car without being told why or of Guin's condition. He was later charged with burglary of Guin's trailer and kidnapping her. After a three day trial, Bounds was found guilty of the lesser included offense of willful trespass as to Count

I, and a mistrial was declared as to Count II because the jury was unable to reach a verdict.

¶13. Aggrieved of this finding by the trial court, Bounds perfected his appeal to this Court raising the following issues:

## DISCUSSION OF ISSUES

**I. THE TRIAL COURT ERRED IN GRANTING THE STATE'S PEREMPTORY CHALLENGES OF JURORS ON THE BASIS OF GENDER WHICH AMOUNTED TO INTENTIONAL DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE AND THEN IMPROPERLY DENIED DEFENDANT BOUNDS PEREMPTORY CHALLENGES, EVEN AFTER A GENDER NEUTRAL EXPLANATION HAD BEEN GIVEN.**

¶14. The voir dire in this case was conducted the day after *J.E.B. v. Alabama*, 114 S. Ct. 1419 (1994), was handed down by the United States Supreme Court which extended *Batson v. Kentucky*, 106 S. Ct. 1712 (1986), protection to gender. This Court holds that all of the case law following and interpreting *Batson* now applies to *J.E.B.* and gender discrimination issues. In other words, race-neutral reasons are also permissible gender-neutral reasons, and the same analysis from *Batson* applies. In following that decision, the trial judge explained to the attorneys that a peremptory strike would have to be based both on a race-neutral and a gender-neutral reason for it to be granted. With no other guidance than *Batson* and its progeny, along with *J.E.B.*, the trial judge proceeded with voir dire, and both sides entered objections to the peremptory strikes made by the other side.

¶15. Bounds argues that the State intentionally sought to exclude males from the jury panel using its peremptory strikes, thereby violating the Equal Protection Clause. Bounds fails to note in his brief and to call this Court's attention to the fact that all of his peremptory strikes were used in an attempt to exclude females from the jury. We fail to see how justice can be served by allowing Bounds to argue to this Court that the trial court committed error by allowing the State to exclude males from the jury with its peremptory strikes, while he tried to exclude females from the jury. However, at each objection entered by Charles Wright, Bounds' attorney, Dave Harbour, the assistant district attorney gave gender-neutral reasons for the strike. Further, Harbour noted for the record that one of the jurors he "passed over, was a male." This was not a violation of the Equal Protection Clause.

¶16. Bounds further argues to this Court that the trial judge denied his peremptory strikes of three jurors even after he gave gender-neutral reasons. The Court notes that the trial court allowed several other of Bounds' peremptory strikes. The trial judge should give a "clear and reasonably specific" explanation for his ruling when determining if an explanation is sufficiently gender-neutral. *Hatten v. State*, 628 So. 2d 294, 298 (Miss. 1993); *see also Lockett v. State*, 517 So. 2d 1346, 1350 (Miss. 1987). For the strikes that were denied by the trial court, there was noexplanation given.

¶17. The *J.E.B.* decision was noted by this Court in *Duplantis v. State*, 644 So. 2d 1235, 1246 (Miss. 1994), when the Court brought to the trial courts' attention the extension of *Batson* to gender-based exclusion of jurors. *J.E.B.* explained that

Failing to provide jurors the same protection against gender discrimination as race

discrimination could frustrate the purpose of *Batson* itself. Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination. Allowing parties to remove racial minorities from the jury not because of their race, but because of their gender, contravenes well-established equal protection principles and could insulate effectively racial discrimination from judicial scrutiny.

*Duplantis*, 644 So. 2d at 1246.

¶18. The peremptory strikes, the objections to those strikes, and the judge's ruling were made on the record as follows:

BY MR. WRIGHT: D-4 will be Ms. Dorman.

BY MR. HARBOUR: Objection.

\* \* \*

BY THE COURT: Give me a reason for striking Juror No. 45.

BY MR. WRIGHT: The family of the Guins live on or around Pine Springs Road. The incident occurred on Pine Springs Road. And there may be some relationship or knowledge of the folks, of the Guins.

BY MR. HARBOUR: Judge, there is no evidence of that.

BY THE COURT: I'm not going to allow that strike.

\* \* \*

BY MR. WRIGHT: Well, I'll proffer to the Court that the incident occurred on Pine Springs Road or about Pine Springs Road.

BY THE COURT: Mr. Wright, you can make your statement and then I'm going to make a ruling and we're going to move on. We're not going to argue about each juror.

\* \* \*

BY MR. WRIGHT: Number 32.

BY MR. HARBOUR: Objection, judge.

BY THE COURT: Give me an explanation for striking Juror No. 32.

BY MR. WRIGHT: She didn't respond to any of the questions. I had no eye contact with her. She seemed indifferent to the situation that was presented during voir dire.

BY MR. HARBOUR: I will agree with Mr. Wright that she didn't respond to any questions, Judge.

BY THE COURT: I'm not going to accept that strike for those reasons.

* * *

BY MR. WRIGHT: Strike No. 24.

BY MR. HARBOUR: Objection, Judge. The list reflects that she has a female's name, I believe she's a female. Mr. Wright has stricken nearly exclusively females and my notes reflect that she did not respond to any question during voir dire.

BY MR. WRIGHT: That's the basis of my striking her. She was indifferent to the questioning. She seemed listless and inattentive.

BY THE COURT: All right. I will deny that request to strike her.

¶19. Though not denying all of Bounds' peremptory strikes, the judge did deny those above, even after hearing the gender-neutral reasons. Such findings will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence. *Hatten*, 628 So. 2d at 299. This Court allows the trial court great deference in determining whether the offered explanation under the unique circumstances of the case is truly a gender-neutral reason. *Stewart v. State*, 662 So. 2d 552, 558 (Miss. 1995).

¶20. The problem here is there is no clear or specific explanation for his ruling as required by *Lockett*. *Hatten*, 628 So. 2d at 299. As noted by this Court in *Stewart*, a peremptory challenge does not have to be supported by the same degree of justification required for a challenge for cause. *Id.*; *Batson*, 106 S. Ct. at 1723; *Harper v. State*, 635 So. 2d 864, 867 (Miss. 1994); *Benson v. State*, 551 So. 2d 188, 192 (Miss. 1989). The trial judge did not give a basis for the denial of the peremptory strikes after the gender neutral reasons were given. He just stated on the record that he was denying the claim. There is no way to tell from the record why he denied the strike. This is clearly contrary to the earlier holdings of this Court. Clear and reasonably specific explanations for his ruling should be made on the record. *Lockett*, 517 So. 2d at 1350. In light of this Court's previous rulings interpreting *Batson*, which is now applicable not only to race but also to gender as a result of *J.E.B.*, the trial judge committed reversible error in not giving clear and reasonably specific explanations for his denial of Bounds' peremptory strikes.

¶21. In *Lockett*, this Court listed in an appendix cases from other jurisdictions which provided racially neutral reasons for striking a potential juror. *Id.* at 1356-57. Several of those cases listed inattentiveness as a valid racially neutral reason for striking a juror. *Id.* The Court in *Lockett* borrowed the rationale from *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir. 1987), and held that a potential juror's demeanor is sufficient as a race-neutral reason to allow a peremptory strike. *Lockett*, 517 So. 2d at 1351. Because *J.E.B.* extended the holding in *Batson* to gender, demeanor is a proper gender-neutral reason to allow a peremptory strike.

¶22. In the case sub judice, the trial judge disallowed Bounds' two peremptory strikes based on the witness's lack of eye contact, inattentiveness, lack of responsiveness to questioning, and general indifference to the voir dire process. In other words, Bounds gave reasons that described the jurors' demeanor; yet, he was denied the peremptory strike for that reason. This Court joined a variety of

other jurisdictions in accepting demeanor as a legitimate, race-neutral basis for a peremptory challenge. ***Walker v. State***, 671 So. 2d 581, 628 (Miss. 1995). Further, the trial judge did not make a "clear and reasonably specific record" as to what his reason was in denying the peremptory strike. This was error requiring reversal because it violated the holdings in ***Batson*** and ***J.E.B***.

¶23. The trial judge denied one of Bounds' peremptory strikes because the gender-neutral reason given by Bounds' attorney was not supported by the record.

> BY MR. WRIGHT: D-4 will be Ms. Dorman.

> BY MR. HARBOUR: Objection.

* * *

> BY THE COURT: Give me a reason for striking Juror No. 45.

> BY MR. WRIGHT: The family of the Guins live on or around Pine Springs Road. The incident occurred on Pine Springs Road. And there may be some relationship or knowledge of the folks, of the Guins.

> BY MR. HARBOUR: Judge, there is no evidence of that.

> BY THE COURT: I'm not going to allow that strike.

Even when Bounds' made a proffer to the trial judge that the alleged burglary and kidnapping happened in an area where the juror lived, the trial judge would not grant the peremptory strike.

> BY MR. WRIGHT: Well, I'll proffer to the Court that the incident occurred on Pine Springs Road or about Pine Springs Road.

> BY THE COURT: Mr. Wright, you can make your statement and then I'm going to make a ruling and we're going to move on. We're not going to argue about each juror.

¶24. This Court in ***Lockett*** declined to limit an attorney's use of legitimate informational sources available as to jurors. ***Id.*** at 1353. Also, the attorney did not have to question the juror in open court before such information could be used as a racially neutral reason to make a peremptory strike, as long as there was no evidence of racial discrimination. ***Id.*** Certainly, this must also apply to gender-neutral reasons for peremptory strikes. In Appendix I of the ***Lockett*** decision this Court listed race-neutral reasons for allowing peremptory strikes in an attempt to provide some guidance to the trial judges in Mississippi. "Living near the defendant" was one of the reasons listed for allowing a race-neutral peremptory strike. ***Id.*** at 1356, *citing* ***Taitano v. State***, 358 S.E.2d 590 (Va. 1987).

¶25. Although there was no evidence presented, other than Mr. Wright's proffer, to the effect that Juror No. 45 lived on or around Pine Springs Road, according to ***Lockett***, no more was needed. Further, if "living near the defendant" has been adopted by this Court to be an acceptable race-neutral reason, the Court finds that it is not too tenuous to interpret the prior case law and hold that living near the victim is also an acceptable reason to allow a peremptory strike. This Court has repeatedly held that a race [gender]-neutral reason for a peremptory strike does not have to rise to the level of a

challenge for cause. *Walker*, 671 So. 2d at 628; *Griffin v. State*, 607 So. 2d 1197, 1202 (Miss. 1992); *Lockett*, 517 So. 2d at 1352. The trial judge committed reversible error by not allowing Bounds' peremptory strikes after the reasons were articulated to the court. Therefore, this case should be remanded for a new trial based on this issue.

### II. THE TRIAL COURT ERRONEOUSLY ALLOWED THE ADMISSION AND PREJUDICIAL USE BY THE PROSECUTOR OF EVIDENCE OF OTHER BAD ACTS, MISCONDUCT AND CRIMES WHOSE PREJUDICIAL EFFECT OUTWEIGHED ANY PROBATIVE VALUE.

¶26. Bounds argues that the trial judge impermissibly allowed testimony of other bad acts into evidence that unfairly prejudiced him in the eyes of the jury. The State introduced extrinsic evidence of other "bad acts" committed by Bounds claiming that it was admissible to prove knowledge under Rule 404(b) of the Mississippi Rules of Evidence, which provides:

> (b) Other Crimes, Wrongs, or Acts.
>
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**Miss.R.Evid. 404(b).** (emphasis added).

¶27. Bounds claims that the incidents that were introduced by the State had no connection to either of the two crimes for which he was on trial. The following three incidents were presented to the jury:

> 1. That at some unspecified time in the past the defendant "got drunk and got hold of a gun and shot a hole through the kitchen wall of his grandmother's house."[1]
>
> 2. That Bounds at times grabbed Guin by the shoulders and shook her head violently.
>
> 3. That Bounds slapped the victim with his open fist.

¶28. The first incident came before the jury when the prosecutor asked Guin about her state of mind while, as she testified, she was being dragged to the car.

> Q. So what was your emotional state or your state of mind while this was going on, while you were being dragged to the car?
>
> A. I was scared to death and I was scared for my unborn child and I would have done anything so that he wouldn't have killed me at that point in time.
>
> Q. All right. What had he done to you in the past that made you think that he was capable of killing you?
>
> A. He shot at me one time.
>
> Q. When was that?

An objection was made by Mr. Wright as to the time frame and relevance of this incident. The trial judge overruled the objection when the State responded that the question was in relation to what had Bounds done in the past to make Guin think that he was capable of killing her. It is true that a determination of the relevance of evidence is left to the sound discretion of the trial judge whose determination will not be reversed in the absence of clear abuse. *Watts v. State*, 635 So. 2d 1364, 1367 (Miss. 1994), *citing* **Lambert v. State**, 462 So. 2d 308, 313 (Miss. 1984). After the judge's ruling the following took place:

> A. We were at his grandmother's house in Newton one night and Ken got drunk and hold of a gun. And I was in the kitchen and he shot it through the wall. And there is a hole in the wall and the bullet ricocheted and went up into the ceiling.
>
> Q. Was he pointing the gun at you?
>
> A. Yes. I was on the other side of the wall.
>
> Q. What else has he done to you to make you think that he was capable of killing you?

To which, Mr. Wright objected and requested to make a motion outside the presence of the jury. Mr. Wright moved for a mistrial based on the purposeful intent of the prosecutor bringing out information that was highly irrelevant, immaterial, and highly prejudicial. The State responded:

> Yes, sir. Judge. We're talking about a kidnapping case here and the defendant's state of mind, first of all, is very relevant. That's why I asked it here. But not only could it be admissible for that purpose, it could be admissible under 404(b). We have a long chain of conduct between Brenda Guin, the victim in this case, and Kenneth Bounds, which Mr. Wright alluded to in his opening statement. Their whole relationship is at issue here because it all led up to this breakup and then to him doing that. And the way he treated her and the things he did to her in the past is relevant. And the shooting incident, Your Honor, was, I will admit, directly in response to a question because I asked for that information and it came in without objection. And I think that. . . .

¶29. This Court first noted that in order to pass muster under MRE 404(b), evidence must "be such that it satisfies some other evidentiary purpose beyond simply showing that the defendant is the sort of fellow likely to commit the crime charged. . ." *Watts*, 635 So. 2d at 1368, *quoting* **Jenkins v. State**, 507 So. 2d 89, 92 (Miss. 1987). If the evidence is allowed under Rule 404(b), it must still pass through Rule 403, which is the "ultimate filter through which all otherwise admissible evidence must pass." *Id.*

¶30. The trial judge made the 403 analysis by issuing the following ruling set out below verbatim:

> All right. The question was what had the defendant done to make you think that he would harm you or kill you. Obviously, the state of mind of the victim is an issue in this case. The credibility of the witnesses are an issue in this case. Basically, you have one victim against one defendant. So credibility is an issue in this case. The victim is claiming burglary and kidnapping. The defendant is claiming a lover's quarrel. That's what this case is about. Under Rule 404, evidence of other crimes are not admissible to prove the character of a person in order to show that he

acted in conformity therewith. These acts may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absent mistake or accident. Certainly, on the front end, first, the Court makes a finding that they would be admissible to intent. Before they could be admissible, the Court has to rule whether they are relevant under Rule 401 and whether they are more probative than prejudicial. Because of the issues involved in this case, obviously--well, the Court is finding that they are more probative than prejudicial. But these show the intent of the defendant, the state of mind of the victim, and they are very probative in the Court's opinion. And any further acts, if you are going to solicit those, including this shooting, I need a time frame because that's also relevant.

(emphasis added).

¶31. The trial judge required a time frame for any "bad act" evidence, including the shooting, because it was relevant as to when the acts occurred. However, no time frame was ever established as to when the events took place. The only mention of a time frame, which was a one-year period, is during the proffered testimony of Guin. During the proffer, the trial judge determined that none of the proffered testimony would or could come in because the State had failed to submit any of that evidence to the defense through discovery.

¶32. The only mention of a time frame in front of the jury was vague statements by Guin like "one night" and "one time". There is no establishment of an exact or even an approximate time frame. While the trial judge ruled that the bad acts could come in based on their probative value outweighing their prejudicial value, he erred in allowing them to come in without establishing a time frame. The lack of at least an approximate time frame completely ignores Mississippi Rules of Evidence 401 and 403 as to relevancy and misleading the jury. The lack of a time frame would seem to allow any bad act committed at any time by a defendant to come into and place him in a bad light in front of a jury. This is exactly what the Rules of Evidence seek to prevent. The trial judge erred by not requiring a time frame to be established in front of the jury.

¶33. The prosecutor, upon objection by defense counsel, stated to the trial judge outside the presence of the jury that Guin would additionally testify that Bounds slapped her and pushed her around and pushed her into a wall, hitting her head, and things of that nature, through the course of the relationship. The trial judge allowed Guin to give such testimony as proffered outside the presence of the jury, where she testified as contemplated by the prosecutor; however, she further testified that Bounds had attempted to run her off the road and would beat her if she did not make love to him. The trial judge ruled this testimony to be inadmissible and did not allow the jury to hear it.

¶34. The other two "bad acts" of Bounds were solicited by the prosecutor when he cross-examined Artie Bounds, the defendant's mother. The prosecutor, in direct contradiction to the earlier ruling by the trial judge, questioned Mrs. Bounds in the following manner:

Q. All right. You weren't there any of the times when he grabbed her by the shoulders and shook her head violently, were you?

A. No.

Q. You weren't there when he grabbed her and shook her and slammed her head up against the

wall, were you?

A. No.

Q. You weren't there when he slapped her with his open fist, were you?

A. No.

¶35. The trial judge in his earlier ruling had reserved the right to allow the State to rebut any claims by Bounds that he had never raised a hand to Guin. The defendant had not at the time of Mrs. Bounds' testimony testified. The problem is that the State, in essence, testified before the jury with argumentative questions as to the bad acts and got Mrs. Bounds to respond that she had never witnessed any such event. While argumentative questions are permissible on cross-examination, this Court will not allow a prosecutor to circumvent a trial judge's ruling by soliciting prohibited information from another witness on cross-examination.

¶36. The State calls this Court's attention to the fact that defense counsel failed to make a timely objection. It is true that defense counsel failed to make an objection to the actions of and the information solicited by the prosecutor until it had been presented to the jury. This Court has held on more than one occasion that an attorney may not refrain from objecting to a question, thinking that the answer may be favorable to him, and, when it is unfavorable, object and ask for a mistrial. *Pennington v. State*, 437 So. 2d 37, 40 (Miss. 1983). This Court reiterated its position regarding untimely motions in *Mitchell v. State*, 539 So. 2d 1366, 1373 (Miss. 1989). There this Court stated that the trial judge must have an opportunity to consider and cure the objection before counsel can move for a mistrial. *Id.*

¶37. Because Bounds' attorney failed to timely object to the questioning by the State, he should have at least moved the court for a limiting instruction to the jury. The only way he could have mitigated the "damage" done to his case at that point would have been by requesting a limiting instruction by the judge. The *Watts* decision stressed the importance of a limiting instruction by the trial judge. *Watts*, 635 So. 2d at 1368-69. Yet, defense counsel did not request one in light of the "bad act" evidence being presented to the jury.

¶38. It was not until the recent decision by this Court in *Smith v. State*, 656 So. 2d 95, 100 (Miss. 1995), that a trial judge was required to give a limited instruction sua sponte. There the Court analogized the 404(b) situation to impeachment by prior conviction under MRE 609, where it was suggested that a limiting instruction be given in order to minimize the risk that the jury will infer guilt from the previous conduct. *Id.* Going further, the Court looked to federal cases that allowed character evidence under MRE 404(b) which recognized the necessity of a limiting instruction. *See e.g. United States v. Davis*, 15 F.3d 526 (6th Cir. 1994). However, in the *Smith* case, this Court failed to reverse because of the language in MRE 105, dealing specifically with restrictive or limiting instructions where it states such instructions should be given upon request, and in the absence of a request, there is no error. It was the Court's decision that in the future wherever 404(b) evidence is offered, and there is an objection which is overruled, the objection shall be deemed an invocation of the right to a MRE 403 analysis and a limiting instruction. *Smith*, 656 So. 2d at 100.

¶39. Because the case sub judice was heard prior to the definitive ruling regarding limiting

instructions in *Smith*, the trial judge was not bound by its holding. Thus, standing alone, it was not reversible error for the trial judge to not give, sua sponte, a limiting instruction on the MRE 404(b) evidence. The defense attorney had the burden of objecting contemporaneously and requesting the limiting instruction. However, as this case is to be retried, any retrial should be conducted according to and within the guidelines of *Smith*.

### III. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT OF ACQUITTAL AND/OR IN THE ALTERNATIVE A NEW TRIAL DUE TO INSUFFICIENT EVIDENCE.

¶40. Bounds contests the denial of his motion for directed verdict. However, when his motion was overruled, he proceeded with his case-in-chief. When the defendant proceeds with his case after the State rests and the court overrules the defendant's motion for a directed verdict, the defendant has waived the appeal of that directed verdict. *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995).

¶41. Bounds next contends the evidence presented by the State in this case was insufficient to establish that the defendant committed the offense of willful trespass. He argues that the evidence as presented by the State could only lead reasonable and fair minded jurors to a verdict of not guilty. *Harveston v. State*, 493 So. 2d 365, 372 (Miss. 1986). When "considering whether or not the verdict is contrary to the overwhelming weight of the evidence, this Court must accept the State's position, together with all inferences reasonably flowing therefrom, in the light most favorable to the State's theory of the case." *Murrell v. State*, 655 So. 2d 881 (Miss. 1995), *citing Britt v. State*, 520 So. 2d 1377, 1379 (Miss. 1988).

¶42. The jury in this case heard two conflicting tales of the events that transpired on the night of February 16, 1993. The jurors observed the witnesses and heard their testimony. The verdict shows that the jury found the State and its witnesses to be more credible. If there is substantial evidence consistent with the verdict, evidence which is of such weight and quality that, keeping the burden of proof of beyond a reasonable doubt in mind, "fair-minded [jurors] in exercise of impartial judgment might reach different conclusions," the jury's verdict should be allowed. *Ashford v. State*, 583 So. 2d 1279, 1281 (Miss. 1991), *quoting Butler v. State*, 544 So. 2d 816, 819 (Miss. 1989).

¶43. The Court finds that when taken in the light most favorable to the verdict, the evidence and the reasonable inferences therefrom would lead a reasonable and fair-minded jury to conclude that Bounds was guilty of willful trespass. This argument is without merit.

### CONCLUSION

¶44. The lower court committed reversible error in denying, without a clear and reasonably specific explanation, Bounds' peremptory strikes after his attorney articulated gender-neutral reasons. These were reasons that had previously passed judicial muster under the race-neutral doctrine from *Batson*. Similarly, the trial judge should allow as gender-neutral all reasons previously allowed as race-neutral reasons in light of the holding in *J.E.B.* Because of the trial judge's error, Bounds' rights under the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment were violated. Therefore, this case should be reversed and remanded for a new trial.

¶45. The bad acts of the defendant should not have been allowed into evidence without an

establishment of at least an approximate time frame. The lack of an established time frame allows admission of irrelevant evidence that can be misleading to a jury. Additionally, because a new trial is warranted, the other "bad acts" of the defendant that were admitted into evidence under MRE 404(b) should only be allowed in the trial on remand if a limiting instruction is given, sua sponte, to the jury. The trial judge in keeping with the holding in *Smith*, must give, sua sponte, a limiting instruction and conduct the Rule 403 analysis when evidence is admitted under Rule 404(b), whether explicitly requested or not, as long as an objection is made to the evidence. The mere objection is deemed to be an implied request for a limiting instruction. *Smith*, 656 So. 2d at 100.

¶46. The evidence and the reasonable inferences therefrom would lead a reasonable and fair-minded jury to conclude that Bounds was guilty of willful trespass. This Court finds Bounds argument that the evidence was insufficient to be without merit.

¶47. This Court holds that this case should be reversed and remanded for a new trial in accordance with the Court's findings in this decision.

**¶48. REVERSED AND REMANDED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN AND BANKS, JJ., CONCUR. MILLS, J., CONCURS IN RESULT ONLY. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**

 

 

**McRAE, JUSTICE, DISSENTING:**

 

 

¶49. According to the majority, Kenneth Bounds, by proceeding with his case-in-chief after the circuit judge overruled his motion for directed verdict, has waived the appeal of that denial of directed verdict. The majority also concludes that the State presented sufficient evidence to the jury to establish that Bounds committed the offense of willful trespass. I find fault with these assertions by the majority, and I must therefore respectfully dissent.

¶50. In the civil context, this Court has already decided that a party is not necessarily required to make a motion for a directed verdict or for a peremptory instruction before it can make a motion for a judgment notwithstanding the verdict. *New Hampshire Ins. Co. v. Sid Smith & Assoc.*, 610 So.2d 340, 344 (Miss. 1992). *See* Rule 10.05, Uniform Rules of Circuit and County Practice (1995) (replacing Rule 5.16, Uniform Criminal Rules of Circuit Court Practice (1993)). Therefore, under *New Hampshire Insurance*, in a civil case, if a party moves for a post-trial judgment in its favor (whether or not the party moved for a directed verdict), and the court denies such motion, the moving party may still appeal that denial. The allegation of trial court error has been preserved by the singular motion for judgment notwithstanding the verdict. Since there is no waiver of the right to appellate review in that instance, there should not be a waiver in the criminal context either.

¶51. In the case *sub judice*, Bounds raised an objection at trial, in the form of a motion for a directed

verdict. The trial court denied that motion, and for that, the majority deems Bounds' avenues for appeal closed. "Such a holding, however, is nonsensical and is made only because we have held it before." *New Hampshire Ins.*, 610 So.2d at 344. If Bounds had not raised that motion for directed verdict, and instead only filed his post-trial motion for judgment of acquittal, presumably the majority would have no problem hearing Bounds' appeal of the denial of the post-trial motion. Why, then, should not the reasoning of the *New Hampshire Insurance* case apply in the criminal context?

¶52. Once a motion for directed verdict is raised, and that motion is denied, the grounds for appeal are therefore preserved. It is highly perceivable that a trial court could erroneously fail to direct a verdict in a defendant's favor, when the State has failed to prove every element of a crime beyond a reasonable doubt. To not allow the defendant to appeal such a failure to grant directed verdict, especially in the criminal context, would be offensive to fundamental guarantees of a fair trial found in our state and federal constitutions.

¶53. Having said that, this case presents such an example. The State had the burden of proving that Bounds willfully trespassed upon Brenda Guin's property without her permission. Bounds had reason to believe that he was welcome on the property, based on his previous relationships with Guin. She never made an effort to prevent him from entering the property, and he was allowed to keep items in the trailer. The State failed to adduce sufficient evidence to show that Bounds did not have permission to enter Guin's property. Because the State failed to meet its burden of proof on either the principal count of the indictment, burglary, or its lesser included offense, willful trespass, Bounds was entitled to a directed verdict of not guilty.

¶54. It is for these reasons that I dissent. Based on the State's failure to prove its case beyond a reasonable doubt, I would reverse and render in Bounds' favor.

1. Guin claimed that Bounds was pointing the gun at her during this incident, but went on to state that she was on the other side of the wall.